**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| PETER T. HANSEN, Derivatively On Behalf of FIFTH THIRD BANCORP, | Case No: |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| vs. | |
| GREG D. CARMICHAEL, NICHOLAS K. AKINS, KATHERINE B. BLACKBURN, JORGE L. BENITEZ, EMERSON L. BRUMBACK, THOMAS H. HARVEY, GARY R. HEMINGER, C. BRYAN DANIELS, JEWELL D. HOOVER, EILEEN A. MALLESCH, MARSHA C. WILLIAMS, MICHAEL B. MCCALLISTER and TAYFUN TUZUN, | |
| Defendants, | |
| and | |
| FIFTH THIRD BANCORP, | |
| Nominal Defendant | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Peter T. Hansen ("Plaintiff") alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' (defined below) public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fifth Third Bancorp ("Fifth

Third" or the "Company"), legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery

## I.     <u>NATURE OF ACTION</u>

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Fifth Third's directors and/or officers from February 26, 2016 through the present (the "Relevant Period").

2.     Fifth Third was founded in 1858. The Company operates as a diversified financial services company in the U.S. As of June 30, 2019, the Company operated 1,207 full-service banking centers and 2,551 ATMs in Ohio, Kentucky, Indiana, Michigan, Illinois, Florida, Tennessee, West Virginia, Georgia, and North Carolina.

3.     Fifth Third is the indirect holding company of Fifth Third Bank, National Association ("Fifth Third Bank").

4.     Fifth Third Bank employed a "cross-sell" strategy for many years. Fifth Third Bank used this cross-sell strategy to increase the total number of products and services it provided to existing customers.

5.     Throughout the Relevant Period, Defendants made false and/or misleading statements and/or failed to disclose that: (1) as a result of Fifth Third Bank's aggressive incentive policies to promote its cross-sell strategy, Fifth Third Bank employees engaged in unauthorized conduct with customer accounts; (2) since at least 2008, Fifth Third Bank, and by extension, Fifth Third, was aware of such unauthorized conduct and, thus, that it was violating relevant regulations and laws aimed at protecting its consumers; (3) Fifth Third failed to properly implement and

monitor its cross-sell program, detect and stop misconduct, and identify and remediate harmed consumers; (4) the foregoing subjected the Company to a foreseeable risk of heightened regulatory scrutiny or investigation; (5) Fifth Third's revenues were in part the product of unlawful conduct and thus unsustainable; and (6) as a result, the Company's public statements were materially false and misleading at all relevant times.

6.      On March 2, 2020, the Company filed an Annual Report on Form 10-K with the SEC for the quarter and year ended December 31, 2019 (the "2019 Form 10-K"). According to the 2019 Form 10-K, U.S. Consumer Financial Protection Bureau ("CFPB") "notified Fifth Third that it intends to file an enforcement action in relation to alleged unauthorized account openings."

7.      As a result, the Company's stock price dropped $0.72 per share, or 2.95%, over the following trading sessions to close at $23.68 per share on March 5, 2020. However, the true scope of the Company's alleged wrongdoing, and liability with respect to unauthorized account openings, was left undisclosed in the 2019 Form 10-K, and was actively downplayed by the Company, causing the Company's stock price to continue to trade at artificially inflated prices.

8.      Finally, on March 9, 2020, the CFPB announced that it had filed a lawsuit against Fifth Third Bank in federal court, reporting additional information regarding its investigation into the Company that the Company had previously failed to disclose. The CFPB "allege[d] that for several years," "Fifth Third [Bank], without consumers' knowledge or consent: opened deposit and credit-card accounts in consumers' names; transferred funds from consumers' existing accounts to new, improperly opened accounts; enrolled consumers in unauthorized online-banking services; and activated unauthorized lines of credit on  consumers' accounts." The CFPB further alleged that, "despite knowing since at least 2008 that employees were opening unauthorized consumer-financial accounts, Fifth Third [Bank] took insufficient steps to detect and stop the

conduct and to identify and remediate harmed consumers." The CFPB concluded that Fifth Third Bank "violated the Consumer Financial Protection Act's prohibition against unfair and abusive acts or practices as well as the Truth in Lending Act and the Truth in Savings Act and their implementing regulations."

9. On this news, the Company's stock price dropped $0.64 per share, or approximately 3.5%, to close at $17.66 per share on March 11, 2020, and dropped an additional $1.76 per share the following trading day to close at $15.90 per share on March 12, 2020.

## II. JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

11. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

13. The Court has personal jurisdiction over each of Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

14. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Defendant Daniels resides in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

15.     Venue is proper in this District because Fifth Third and Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## III.   PARTIES

### A.     Plaintiff

16.     Plaintiff is a current shareholder of Fifth Third common stock. Plaintiff has continuously held Fifth Third common stock at all relevant times.  Plaintiff is a citizen of New Hampshire.

### B.     Nominal Defendant Fifth Third

17.     Nominal Defendant Fifth Third is an Ohio corporation with its principal executive offices at 38 Fountain Square Plaza, Cincinnati, Ohio 45263.  Nominal Defendant is a citizen of Ohio.

### C.     Director Defendants

18.     ***Defendant Greg D. Carmichael*** ("Carmichael") has served as the Company's President and Chief Executive Officer ("CEO") since November 2015 and has served as Chairman of the Board of the Directors (the "Board") since 2018.  Defendant Carmichael is a citizen of Ohio.

19.     Defendant Carmichael received the following compensation:

| Name | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|------|------|-----------|-----------|------------------|-------------------|-------------------------------------------|----------------------------|-----------|
| Carmichael | 2019 | $1,100,070 | $0 | $4,462,507 | $787,498 | $2,200.000 | $449,162 | $8,999,237 |
|  | 2018 | $1,088,531 | $0 | $4,887,480 | $862,496 | $4,100,000 | $235,145 | $11,173,652 |
|  | 2017 | $1,000,064 | $0 | $4,526,248 | $798,750 | $2,000,000 | $363,230 | $8,688,292 |

20.     During the Relevant Period, Defendant Carmichael made the following Company stock sales:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 10/29/2019 | 55,251 | $29.59 | $1,634,877.09 |
| 02/13/2018 | 87,613 | $32.37 | $2,836,032.81 |
| 11/16/2016 | 36,821 | $25.11 | $924,575.31 |
| 11/10/2016 | 17,689 | $23.45 | $414,807.05 |

21.     **Defendant Nicholas K. Akins** ("Akins") has served as a Company director since 2013.   Defendant Akins also serves as Chair of the Nominating and Corporate Governance Committee, and as a member of the Finance Committee and Human Capital and Compensation Committee.  Defendant Akins is a citizen of Ohio.

22.     **Defendant Katherine B. Blackburn** ("Blackburn") has served as a Company director since 2014.   Defendant Blackburn also serves as a member of the Nominating and Corporate Governance Committee and the Risk and Compliance Committee.   Defendant Blackburn is a citizen of Ohio.

23.     **Defendant Jorge L. Benitez** ("Benitez") has served as a Company director since 2015.   Defendant Benitez also serves as a member of the Audit, Nominating and Corporate Governance, and Risk and Compliance Committees.   Defendant Benitez is a citizen of Colorado.

24.     **Defendant Emerson L. Brumback** ("Brumback") has served as a Company director since 2009.  Defendant Brumback also serves as Chair of the Audit Committee and as a member of the Finance Committee.  Defendant Brumback is a citizen of Florida.   During the Relevant Period, Defendant Brumback made the following sale of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 03/05/2018 | 3,000 | $33.44 | $100,320.00 |

25.     **Defendant Thomas H. Harvey** ("Harvey") has served as a Company director since 2019.  Defendant Harvey also serves as a member of the Risk and Compliance Committee and the Nominating and Corporate Governance Committee.    Defendant Brumback is a citizen of California.

26. **Defendant Gary R. Heminger** ("Heminger") has served as a Company director since 2006. He also serves as Chair of the Finance Committee and as a member of the Human Capital and Compensation Committee and the Nominating and Corporate Governance Committee. Defendant Heminger is a citizen of Ohio.

27. **Defendant C. Bryan Daniels** ("Daniels") has served as a Company director since 2019. Defendant Daniels also serves as a member of the Audit Committee and Risk and Compliance Committee. Defendant Daniels is a citizen of Illinois and resides in Winnetka Illinois, in Cook County.

28. **Defendant Jewell D. Hoover** ("Hoover") has served as a Company director since 2009. Defendant Hoover also serves as Chair of the Risk and Compliance Committee, and as a member of the Audit Committee and Finance Committee. Defendant Hoover is a citizen of North Carolina. During the Relevant Period, Defendant Hoover made the following sales of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 06/03/2019 | 3,739 | $26.51 | $99,120.89 |
| 02/12/2018 | 3,700 | $32.40 | $119,880.00 |
| 04/28/2017 | 2,000 | $24.82 | $49,640.00 |

29. **Defendant Eileen A. Mallesch** ("Mallesch") has served as a Company director since 2016. Defendant Mallesch also serves as a member of the Audit, Human Capital and Compensation, and Risk and Compliance Committees. Defendant Mallesch is a citizen of Ohio.

30. **Defendant Marsha C. Williams** ("Williams") has served as a Company director since 2008. Defendant Williams also serves as a member of the Finance Committee and Nominating and Corporate Governance Committee. Defendant Williams is a citizen of Wisconsin.

31.     **Defendant Michael B. McCallister** ("McCallister") has served as a Company director since 2011.   Defendant McCallister also serves as Chair of the Human Capital and Compensation Committee and as a member of the Finance Committee.   Defendant McCallister is a citizen of Utah.

32.     Defendants Carmichael, Akins, Blackburn, Benitez, Brumback, Harvey, Heminger, Daniels, Hoover, Mallesch, Williams, McCallister are herein referred to collectively as the "Director Defendants."

### D.     Officer Defendant

33.     **Defendant Tayfun Tuzun** ("Tuzun") has served as the Company's Executive Vice President and Chief Financial Officer ("CFO") since 2013.  Prior to that, Defendant Tuzun served as the Company's treasurer since 2011 and as its structured finance manager from 2007.

34.     Defendant Tuzun is a citizen of Ohio.

35.     Defendant Tuzun and the Director Defendants are collectively referred to herein as "Defendants."

## IV.     FALSE AND MISLEADING STATEMENTS

36.     On February 25, 2016, Defendants caused the Company to file an Annual Report on Form 10-K with the SEC that reported the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 Form 10-K").   Defendants Carmichael, Tuzun, Williams, Akins, Benitez, Blackburn, Brumback, Heminger, Hoover and McCallister signed the 2015 Form 10-K, along with and non-parties Mark D. Hazel, James P. Hackett, B. Evan Bayh III, Ulysses L. Bridgeman, Jr., Kevin T. Kabat, and Hendrik G. Meijer.  With respect to the Company's cross-sell strategy, the 2015 Form 10-K reported that the Company benefited from

"cross-selling opportunities for [its] commercial products," and that the Company's various "business segments form synergies by taking advantage of cross-sell opportunities."

37.     The 2015 Form 10-K also reported the Company's robust compliance risk management systems, emphasizing that (1) "Fifth Third focuses on managing regulatory compliance risk in accordance with [its] integrated risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring, and reporting risks"; (2) "[t]o mitigate compliance risk, Compliance Risk Management provides independent oversight to ensure consistency and sufficiency, and ensures that lines of business, regions and support functions are adequately identifying, assessing and monitoring compliance risks and adopting proper mitigation strategies" and (3) "[a]dditionally, Compliance Risk Management implements key compliance programs and processes including but not limited to, risk assessments, key risk indicators program, issues tracking, [and] regulatory compliance testing and monitoring[.]"

38.     The 2015 Form 10-K also reported the aspects of the Company's compliance risk management systems, assuring the market/investors that the Company's highest levels of management were kept apprised of ongoing compliance issues identified within the Company and its subsidiaries.  The 2015 Form 10-K reported that (1) "Fifth Third . . . focuses on reporting and escalation of compliance issues to senior management and the Board"; (2) "[t]he Management Compliance Committee addresses Fifth Third-wide compliance issues, industry best practices, legislative developments, regulatory concerns, and other leading indicators of compliance risk"; and (3) "[t]he Management Compliance Committee reports to the Enterprise Risk Management Committee, which reports to Risk and Compliance Committee of the Board of Directors."

39.     Also, the 2015 Form 10-K had generic, boilerplate representations regarding the risks it faced as an entity subject to CFPB oversight, reporting that (1) "the CFPB . . . ha[s] the

authority to compel or restrict certain actions by Fifth Third and its banking subsidiary"; (2) "Fifth Third, as well as other financial institutions more generally, have recently been subjected to increased scrutiny from government authorities . . . stemming from broader systemic regulatory concerns, including with respect to [*inter alia*] . . . consumer compliance and other prudential matters and efforts to ensure that financial institutions take steps to improve their risk management"; and (3) "[i]n this regard, government authorities, including the bank regulatory agencies, are also pursuing aggressive enforcement actions with respect to compliance and other legal matters involving financial activities, which heightens the risks associated with actual and perceived compliance failures[.]"  These risk warnings were generic "catch-all" provisions that were not tailored to the Company's actual known risks with respect to its ongoing violation of pertinent CFPB regulations.

40.     The 2015 Form 10-K contain signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") wherein Defendants Carmichael and Tuzun certified that "[t]he [2015 10-K] fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [2015 Form 10-K] fairly presents, in all material respects, the financial condition and results of operations of [the Company]."

41.     On February 24, 2017, Defendants caused the Company to file an Annual Report on Form 10-K with the SEC for the quarter and year ended December 31, 2016 (the "2016 Form 10-K").   Defendants Carmichael, Tuzun, Williams, Akins, Benitez, Blackburn, Brumback, Heminger, Hoover, Mallesch and Meijer signed the 2016 Form 10-K, along with non-parties Hazel and Bayh.

42.     The 2016 Form 10-K contained substantively the same statements referenced above pertaining to the Company's cross-sell strategy, robust compliance risk management

systems, the reporting aspects of such systems to top-level management, generic representations about the Company's risks as an entity subject to CFPB oversight, and SOX certifications signed by Defendants Carmichael and Tuzun.

43.     On February 28, 2018, Defendants caused the Company to file an Annual Report on Form 10-K with the SEC for the quarter and year ended December 31, 2017 (the "2017 Form 10-K"). Defendants Carmichael, Tuzun, Williams, Bayh, Benitez, Blackburn, Brumback, Heminger, Hoover, Mallesch and McCallister signed the 2017 Form 10-K, along with non-parties Hazel and Bayh.

44.     The 2017 Form 10-K contained substantively the same statements referenced above pertaining to the Company's cross-sell strategy, robust compliance risk management systems, the reporting aspects of such systems to top-level management, generic representations about the Company's risks as an entity subject to CFPB oversight, and SOX certifications signed by Defendants Carmichael and Tuzun.

45.     On March 1, 2019, Defendants caused the Company to file an Annual Report on Form 10-K with the SEC for the quarter and year ended December 31, 2018 (the "2018 Form 10-K"). Defendants Carmichael, Tuzun, Williams, Akins, Bayh, Benitez, Blackburn, Brumback, Heminger, Hoover, Mallesch and McCallister signed the 2018 Form 10-K, along with non-parties Bayh and Hazel.

46.     The 2018 Form 10-K contained substantively the same statements referenced above pertaining to Fifth Third's cross-sell strategy, robust compliance risk management systems, the reporting aspects of such systems to top-level management, generic representations about the Company's risks as an entity subject to CFPB oversight, and SOX certifications signed by Defendants Carmichael and Tuzun.

47.     On January 30, 2020, the Company filed a Form 8-K with the SEC, to which a press release was annexed (the "January 30 Press Release").  The January 30 Press Release reported "changes to certain senior leadership roles in order to position the Company for continued success in executing its key strategic priorities," in areas regarding risk and compliance.  The January 30 Press Release reported that "Frank Forrest, who has served as executive vice president and chief risk officer since 2014, moves into a new role as special advisor for risk and regulatory matters until December 31, 2020, at which time he will retire from the company," with Jamie Leonard, the Company's executive vice president and treasurer for the past six years, appointed his successor.

48.     While remaining silent on the reasons for the Chief Risk Officer's ("CRO") transition to a special advisory role and eventual retirement from the Company, the January 30 Press Release also touted his accomplishments for the Company.  For instance, the January 30 Press Release quoted Defendant Carmichael: "Frank has successfully led our risk management transformation and conversion to a national charter, and we look forward to his continued counsel and contributions as we move through 2020."  He also stated that "[a]t the same time, Jamie [Leonard]'s depth of knowledge about our Company, our financials, our risk appetite and our strategic priorities, makes him a great fit for this role," and that "[h]is leadership over the past six years as treasurer to deliver strong results with a focus on through-the-cycle outperformance, as well as his leadership throughout the MB Financial integration, highlights the confidence we have in his capabilities in his new role."

49.     Defendants made false and/or misleading statements and/or failed to disclose that: (1) as a result of Fifth Third Bank's aggressive incentive policies to promote its cross-sell strategy, Fifth Third Bank employees engaged in unauthorized conduct with customer accounts; (2) since

at least 2008, Fifth Third Bank, and by extension, Fifth Third, was aware of such unauthorized conduct and, thus, that it was violating relevant regulations and laws aimed at protecting its consumers; (3) Fifth Third failed to properly implement and monitor its cross-sell program, detect and stop misconduct, and identify and remediate harmed consumers; (4) the foregoing subjected the Company to a foreseeable risk of heightened regulatory scrutiny or investigation; (5) Fifth Third's revenues were in part the product of unlawful conduct and thus unsustainable; and (6) as a result, the Company's public statements were materially false and misleading at all relevant times.

## V.    **THE TRUTH BEGINS TO EMERGE**

50.    On March 2, 2020, Defendants caused the Company to file its 2019 Form 10-K, which was signed by Defendants Carmichael, Tuzun, Williams, Akins, Benitez, Blackburn, Brumback, Burris, Daniels, Harvey, Heminger, Hoover, Mallesch and McCallister, along with non-parties Bayh and Hazel, wherein Defendants disclosed that CFPB "notified Fifth Third that it intends to file an enforcement action in relation to alleged unauthorized account openings."

51.    The Company's stock price dropped $0.72 per share, or 2.95%, to close at $23.68 per share on March 5, 2020.  However, the true scope of the Company's alleged wrongdoing, and potential liability with respect to unauthorized account openings, was left undisclosed in the 2019 Form 10-K, and was downplayed, causing the Company's stock price to continue to trade an artificially inflated prices.

52.    For instance, in the sentence following the disclosure regarding the CFPB's impending potential lawsuit, Defendants reassured the markets/investors that "Fifth Third believes that the facts do not warrant an enforcement proceeding and intends to defend itself vigorously if

such an action should be filed," and that "[t]he impact of this potential enforcement action has been reflected in our reasonably possible losses."

53.     Moreover, the 2019 Form 10-K contained the same statements referenced above, pertaining to the Company's cross-sell strategy, robust compliance risk management systems, the reporting aspects of such systems to top-level management, generic representations about the Company's risks as an entity subject to CFPB oversight, and SOX certifications signed by Defendants Carmichael and Tuzun.

54.     Defendants made false and/or misleading statements and/or failed to disclose that: (1) as a result of Fifth Third Bank's aggressive incentive policies to promote its cross-sell strategy, Fifth Third Bank employees engaged in unauthorized conduct with customer accounts; (2) since at least 2008, Fifth Third Bank, and by extension, Fifth Third, was aware of such unauthorized conduct and, thus, that it was violating relevant regulations and laws aimed at protecting its consumers; (3) Fifth Third failed to properly implement and monitor its cross-sell program, detect and stop misconduct, and identify and remediate harmed consumers; (4) all the foregoing subjected the Company to a foreseeable risk of heightened regulatory scrutiny or investigation; (5) the Fifth Third's Class Period revenues were in part the product of unlawful conduct and thus unsustainable; and (6) as a result, the Company's public statements were materially false and misleading at all relevant times.

## VI.     THE TRUTH FULLY EMERGES

55.     On March 9, 2020, the CFPB announced that it had filed a lawsuit against Fifth Third Bank in federal court, alleging that Fifth Third Bank had violated the Consumer Financial Protection Act's prohibition against unfair and abusive acts or practices as well as the Truth in

Lending Act and the Truth in Savings Act and their implementing regulations. The CFPB's press release addressing this complaint stated:

> The [CFPB] today filed a lawsuit in federal district court in the Northern District of Illinois against Fifth Third Bank, National Association (Fifth Third). The Bureau alleges that for several years Fifth Third, without consumers' knowledge or consent: opened deposit and credit-card accounts in consumers' names; transferred funds from consumers' existing accounts to new, improperly opened accounts; enrolled consumers in unauthorized online-banking services; and activated unauthorized lines of credit on consumers' accounts. The Bureau alleges that Fifth Third violated the Consumer Financial Protection Act's prohibition against unfair and abusive acts or practices as well as the Truth in Lending Act and the Truth in Savings Act and their implementing regulations.
>
> The Bureau specifically alleges that for years and continuing through at least 2016, Fifth Third used a "cross-sell" strategy to increase the number of products and services it provided to existing customers; used an incentive-compensation program to reward selling new products; and conditioned employee-performance ratings and, in some instances, continued employment on meeting ambitious sales goals. The Bureau further alleges that, despite knowing since at least 2008 that employees were opening unauthorized consumer-financial accounts, Fifth Third took insufficient steps to detect and stop the conduct and to identify and remediate harmed consumers.

56.     On this news, the Company's stock price dropped $0.64 per share, or approximately 3.5%, to close at $17.66 per share on March 11, 2020, and dropped an additional $1.76 per share the following trading day to close at $15.90 per share on March 12, 2020.

**A.      Background of Defendants' Misconduct**

57.     Fifth Third is an Ohio-based diversified financial services company founded in 1975. The Company is organized as a banking holding company and is the indirect holding company of Fifth Third Bank.

58.     The Company operates 1,149 full-service banking centers and 2,481 branded ATMs across the Midwest. As of December 31, 2019, the Company had $169 billion in assets. Through its subsidiaries, the Company offers a wide range of financial products and services to the commercial, financial, retail, governmental, educational, energy and healthcare sectors,

including checking, savings and money accounts, credit cards, and wealth management solutions.

59.     Fifth Third and/or the Bank are subject to regulation and supervision by certain regulatory agencies, including the CFPB.

### (1)    Deposit Accounts

60.     According to the complaint entitled *Bureau of Consumer Financial Protection v. Fifth Third Bank, National Association*, Case: 1:20-cv-01683 (N.D. Ill.) (the "CFPB Complaint"), Fifth Third Bank, National Association imposed aggressive sales goals for its employees to open new deposit accounts, and its incentive-compensation program rewarded employees for opening new deposit accounts funded with a specified minimum balance within a defined period.

61.     From at least 2010 through at least 2016, Fifth Third Bank, National Association opened deposit accounts for existing Fifth Third customers without the customers' knowledge or consent.

62.     Some of these unauthorized accounts were "funded" when a banker transferred funds to the unauthorized account from the same consumer's authorized account without the consumer's knowledge or consent.  Often, once an unauthorized account was "funded," such that it qualified under the sales-goal tracking or incentive program, the banker transferred the funds back to the consumer's authorized account, again without the consumer's knowledge or consent.

63.     Opening deposit accounts without consumers' knowledge or consent and moving consumers' funds without their knowledge or consent exposed consumers to risks of harm, including that they would be unable to meet their financial obligations, would incur fees, or would experience negative effects on their consumer-reporting-agency information.

64.     Fifth Third Bank, National Association charged unjustified fees to many consumers who had deposit accounts opened without their knowledge or consent and whose funds were transferred from their existing accounts to their new, improperly opened accounts.

### (2)     Credit Cards

65.     According to the CFPB Complaint, Fifth Third Bank, National Association imposed aggressive sales goals for its employees to sell credit cards to consumers, and its incentive-compensation program rewarded employees for selling new credit cards.

66.     From at least 2008 through at least 2016, Fifth Third Bank, National Association issued credit cards to existing customers without their knowledge or consent.

67.     By 2009, at the latest, Fifth Third Bank, National Association noticed a spike in unauthorized credit cards being issued to consumers.

68.     Despite recognizing the increasing number of unauthorized credit cards, Fifth Third Bank, National Association continued to emphasize sales and to maintain credit-card sales goals and incentive compensation.

69.     Issuing credit cards without consumers' knowledge or consent exposed consumers to risks of harm, including unjustified fees for the unauthorized credit cards and negative effects on their consumer-reporting-agency information. Fifth Third Bank, National Association charged many of these consumers unjustified fees.

### (3)     Enrollment in Online Banking

70.     According to the CFPB Complaint, Fifth Third Bank, National Association imposed aggressive sales goals for its employees to enroll consumers in its online-banking services, and its incentive-compensation program rewarded employees for enrolling consumers in those services.

71.     From at least 2010 through at least 2016, Fifth Third Bank, National Association enrolled consumers in online-banking services without their knowledge or consent.

72.     Fifth Third Bank, National Association's enrollment of consumers in online-banking services without their knowledge or consent exposed consumers to the risk of harm, including increased risk of data theft, money theft, and improper personal-data use.

### (4)     Opening of Early Access

73.     According to the CFPB Complaint, Early Access is a fee-based line of credit that allows Fifth Third Bank, National Association's deposit-account holders to withdraw funds from their deposit accounts before the funds have been deposited in the accounts.  Fifth Third Bank, National Association imposed aggressive sales goals for its employees to sell Early Access to consumers, and its incentive-compensation program rewarded employees for enrolling consumers in "fee-based products," including Early Access.

74.     Fifth Third Bank, National Association opened Early Access lines of credit on consumers' deposit accounts without their knowledge or consent.  Fifth Third Bank, National Association was aware of this by June 2010, when senior management was notified of an increase in the number of calls by employees to the internal whistleblower hotline regarding the unauthorized opening of Early Access lines of credit.

75.     Fifth Third Bank, National Association opened unauthorized Early Access lines of credit from at least 2010 through 2014, and Fifth Third Bank, National Association retained unauthorized Early Access lines of credit even after it stopped offering new Early Access lines of credit.

76.     Fifth Third Bank, National Association's opening and retention of these unauthorized lines of credit risked harm to consumers, including to their consumer-reporting-agency information.

## VII.   FIDUCIARY DUTIES OF DEFENDANTS

77.     By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

78.     Each director and officer of the Company owes to Fifth Third and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

79.     Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

80.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

81.     Defendants, by virtue of their positions as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as

well as in the use and preservation of its property and assets. The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of Defendants who were also officers and directors of the Company has been ratified by the remaining Defendants who collectively comprised the Board at all relevant times.

82. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

83. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Illinois and the United States, and

pursuant to Fifth Third's own Code of Business Conduct & Ethics (the "Code of Conduct");

(b)　　conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)　　remain informed as to how Fifth Third conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)　　establish and maintain systematic and accurate records and reports of the business and internal affairs of Fifth Third and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)　　maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Fifth Third's operations would comply with all applicable laws and Fifth Third's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)　　exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)　　refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

21

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

84.     Each of the Defendants further owed to Fifth Third and the shareholders the duty of loyalty requiring that each Defendant favor Fifth Third's interest and that of its shareholders over his or her own while conducting the affairs of the Company and refrain from using his or her position, influence, or knowledge of the affairs of the Company to gain personal advantage.

85.     Because of their advisory, executive, managerial, and directorial positions with Fifth Third, each of the Defendants had access to adverse, non-public information about the Company.

86.     Defendants, because of their positions of control and authority were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements made by Fifth Third.

## VIII.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

87.     In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  Defendants caused the Company to conceal the true facts as alleged herein.  Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

88.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets.

89.     Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  In furtherance of this plan, conspiracy, and course of conduct, Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each Defendant, who are directors of Fifth Third, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

90.     Each Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

91.     At all times relevant hereto, each Defendant was the agent of each of the other Defendants and of Fifth Third and was at all times acting within the course and scope of such agency.

IX.     **THE COMPANY'S CODE OF CONDUCT**

92.     The Company's Code of Conduct "applies to all officers, directors, employees and contractors of Fifth Third Bancorp, our subsidiaries and our affiliates." The Code of Conduct provides that "[k]eeping the customer at the center of everything we do and delivering a world-class customer experience every time are paramount to our success." According to the Code of Conduct, "every employee plays a part in building and maintaining a strong culture at Fifth Third, a culture in which ethics and compliance are the standard."

93.     In addition to adhering with the Code of Conduct: "[e]very employee has a responsibility to . . . raise issues when you become aware of misconduct or other violations of our Code." In a section entitled "A Safe and Healthy Work Environment," the Code of Conduct states:

> Fifth Third is committed to providing a workplace where employees and visitors feel safe. It is the responsibility of our managers and all of our employees to maintain a workplace free from threats and acts of violence. Fifth Third prohibits the use of violence or threats of violence in the workplace and takes such actions very seriously. We do not tolerate threatening, intimidating or physically harmful behavior by employees, customers, contractors, vendors, suppliers, partners or anyone else.

94.     The Code of Conduct further provides in a section entitled "Fair and Honest Business Practices":

> Unethical business practices are strictly prohibited. Examples of such activities include, but are not limited to:
>
> - Incentive gaming.
> - Falsifying documents or inflating performance results.
> - Manipulating records.
> - Opening bogus or fake accounts.
> - Opening accounts or selling products without customer authorization.
> - Offering customers unnecessary products.
> - Falsifying records or applications in order to benefit yourself or other Fifth Third employees.

95.     The Code of Conduct also provides that "Fifth Third is committed to providing customers with financial products and services in ways that avoid any practices that could be deemed predatory, unfair, deceptive or abusive."

96.     The Code of Conduct further provides that the Company is committed to "minimizing the impact of internal and external fraud to both Fifth Third and our customers. Every employee at every level of the Bancorp is accountable and expected to do his or her part to protect Fifth Third and our customers from fraudulent activity." In addition, the Code of Conduct states that there "is zero tolerance for internal fraud within Fifth Third's organization and internal

24

fraudulent activity must be referred to Bank Protection when suspected. Failure to report fraudulent activity exposes Fifth Third to regulatory and compliance violations and could lead to significant financial penalties and additional fraud losses."

97.    The Code of Conduct also provides that "[y]ou may not buy, sell or recommend the securities (or derivatives in respect thereof) of any issuer (including Fifth Third) for any proprietary, customer, employee, or other account while in possession of material, non-public information (MNPI)."

98.    The Code of Conduct contains an entire chapter dedicated to "Protecting Fifth Third and Our Customers." In a section entitled "Maintaining Accurate Records and Accounts," the Code of Conduct provides:

> Business and financial records are critical to Fifth Third Bancorp's operations. We rely on the integrity and accuracy of those records for both internal decision-making and for the benefit of our investors, government agencies, regulators and others to whom we report. It is imperative that all records and public communications, including, but not limited to, those fled or produced with the Securities Exchange Commission, are complete, fair, accurate, timely, clear and transparent.

99.    In violation of the Code of Conduct, Defendants conducted little, if any, oversight over the Company's internal controls over public reporting and of the Company's engagement in the customer account misconduct and Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Moreover, three Defendants violated the Code of Conduct by engaging in insider trading.

## X.    REPURCHASES OF COMPANY STOCK DURING THE RELEVANT PERIOD

100.    During the Relevant Period, Defendants caused the Company to initiate

25

repurchases of its common stock that substantially damaged the Company. The Company spent an aggregate amount of over $5.6 billion to repurchase approximately 216,504,051 shares of its own common stock at artificially inflated prices from March 2016 through the end of February 2020.

101.    As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the Company overpaid approximately $2.1 billion in total for these repurchases.

102.    According to the Company's quarterly report on Form 10-Q filed with the SEC on May 6, 2016, during the month of March 2016, the Company purchased 12,721,622 shares of its common stock for approximately $205.8 million at an average price of $16.18 per share.

103.    As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the month of March 2016 was approximately $3.5 million.

104.    According to the Company's quarterly report on Form 10-Q filed with the SEC on August 5, 2016, during the three-month period ended June 30, 2016, the Company purchased 4,496,881 shares of its common stock for approximately $78.2 million, at an average price of $17.41 per share.

105.    As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended June 30, 2016 was approximately $6.7 million.

106.    According to the Company's quarterly report on Form 10-Q filed with the SEC on November 9, 2016, during the three-month period ended September 30, 2016, the Company

purchased 11,269,837 shares of its common stock for approximately $209.6 million, at an average price of $18.60 per share.

107.     As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended September 30, 2016 was approximately $30.4 million.

108.     According to the 2016 Form 10-K, during the three-month period ended December 31, 2016, the Company purchased 6,554,479 shares of its common stock for approximately $167.9 million, at an average price of $25.63 per share.

109.     As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended December 31, 2016 was approximately $63.7 million.

110.     According to the Company's quarterly report on Form 10-Q filed with the SEC on May 5, 2017, during the three-month period ended March 31, 2017, the Company purchased 1,630, 221 shares of its common stock for approximately $42.8 million at an average price of $26.26 per share.

111.     As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended March 31, 2017 was approximately $16.8 million.

112.     According to the Company's quarterly report on Form 10-Q filed with the SEC on August 8, 2017, during the three-month period ended June 30, 2017, the Company purchased 12,889,657 shares of its common stock for approximately $321.9 million, at an average price of $24.98 per share.

113. As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended June 30, 2017 was approximately $117 million.

114. According to the Company's quarterly report on Form 10-Q filed with the SEC on November 6, 2017, during the three-month period ended September 30, 2017, the Company purchased 34,061,844 shares of its common stock for approximately $915.5 million, at an average price of $26.88 per share.

115. As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended September 30, 2017 was approximately $373.9 million.

116. According to the 2017 10-K, during the three-month period ended December 31, 2017, the Company purchased 12,309,373 shares of its common stock for approximately $358.8 million, at an average price of $29.15 per share.

117. As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended December 31, 2017 was approximately $163 million.

118. According to the Company's quarterly report on Form 10-Q filed with the SEC on May 4, 2018, during the three-month period ended March 31, 2018, the Company purchased 11,551,101 shares of its common stock for approximately $368.3 million at an average price of $31.89 per share.

119. As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended March 31, 2018 was approximately $184.7 million.

120.     According to the Company's quarterly report on Form 10-Q filed with the SEC on August 8, 2018, during the three-month period ended June 30, 2018, the Company purchased 8,424,794 shares of its common stock for approximately $261.7 million, at an average price of $31.07 per share.

121.     As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended June 30, 2018 was approximately $127.8 million.

122.     According to the Company's quarterly report on Form 10-Q filed with the SEC on November 6, 2018, during the three-month period ended September 30, 2018, the Company purchased 17,071,551 shares of its common stock for approximately $503.6 million, at an average price of $29.50 per share.

123.     As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended September 30, 2018 was approximately $232.1 million.

124.     According to the 2018 Form 10-K, during the three-month period ended December 31, 2018, the Company purchased 15,074,877 shares of its common stock for approximately $404.3 million, at an average price of $26.82 per share.

125.     As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended December 31, 2018 was approximately $164.6 million.

126.     According to the Company's quarterly report on Form 10-Q filed with the SEC on May 10, 2019, during the three-month period ended March 31, 2019, the Company purchased

32,850,392 shares of its common stock for approximately $807 million at an average price of $24.57 per share.

127.     As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended March 31, 2019 was approximately $284 million.

128.     According to the Company's quarterly report on Form 10-Q filed with the SEC on August 8, 2019, during the three-month period ended June 30, 2016, the Company purchased 10,149,506 shares of its common stock for approximately $279.6 million, at an average price of $27.55 per share.

129.     As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended June 30, 2019 was approximately $118.2 million.

130.     According to the Company's quarterly report on Form 10-Q filed with the SEC on November 8, 2019, during the three-month period ended September 30, 2019, the Company purchased 13,680,801 shares of its common stock for approximately $358.1 million, at an average price of $26.18 per share.

131.     As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended September 30, 2019 was approximately $140.6 million.

132.     According to the 2019 Form 10-K, during the three-month period ended December 31, 2019, the Company purchased 10,614,510 shares of its common stock for approximately $312.8 million, at an average price of $29.47 per share.

133.    As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended December 31, 2019 was approximately $144 million.

134.    According to the Company's quarterly report on Form 10-Q filed with the SEC on May 8, 2020, during the month of January 2020, the Company purchased 333,737 shares of its common stock for approximately $9.7 million at an average price of $29.10 per share.

135.    As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the month of January 2020 was approximately $4.4 million.

136.    According to the Company's quarterly report on Form 10-Q filed with the SEC on May 8, 2020, during the month of February 2020, the Company purchased 818,868 shares of its common stock for approximately $23.7 million at an average price of $28.98 per share.

137.    As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the month of February 2020 was approximately $10.7 million.

138.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $2.1 billion.

## XI.    **LOSS CAUSATION**

139.    During the Relevant Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's securities and operated as a fraud or deceit on Relevant Period purchasers of the Company's securities by failing to disclose and misrepresenting the adverse facts and risks detailed herein. Later, when Defendants prior misrepresentations and fraudulent course of conduct, and/or the information alleged herein

to have been concealed from the market, and/or the effects thereof, were revealed to the market, the price of the Company's securities declined significantly as the prior artificial inflation was released from the Company's share price.

140.    As a result of the Company's purchases of the Company's securities during the Relevant Period, the Company suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants false and misleading statements, half-truths, and omissions had the intended effect and caused the Company's securities to trade at artificially inflated levels throughout the Relevant Period.

141.    By concealing from the Company the adverse facts, Defendants presented a misleading picture of the Company's business and prospects.  When the information and/or underlying conditions, and/or effects thereof were revealed to the market through corrective disclosure and/or a materialization of the concealed risk, the price of the Company's securities fell dramatically.  This decline removed the artificial inflation from the price of the Company's securities, causing economic loss to the Company who had purchased its securities during the Relevant Period.

142.    The decline in the price of the Company's securities following the corrective disclosure and/or materialization of the concealed risk was a direct result of the nature and extent of Defendants' fraudulent misrepresentations, half-truths, and omissions being revealed to the market.  The timing and magnitude of the price declines in the Company's securities, Defendants' post-Relevant Period revelations, and analyst reactions to the news negate any inference that the loss suffered by the Company was caused by changed market conditions, macroeconomic or industry factors, unrelated to Defendants fraudulent conduct.

143.    The economic loss, *i.e.*, damages, suffered by the Company was a direct result of Defendants fraudulent scheme and course of conduct to artificially inflate the price of the Company's securities and the subsequent material decline in the value of the Company's securities when Defendants' prior misrepresentations, misleading omissions and half-truths, and other fraudulent conduct were revealed.

## XII.    APPLICATION OF PRESUMPTION OF RELIANCE

144.    The Company is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory:

(a)    Fifth Third's securities were actively traded on the NASDAQ throughout the Relevant Period;

(b)    Fifth Third's securities traded at high weekly volumes during the Relevant Period;

(c)    Defendants filed periodic public reports with the SEC;

(d)    Defendants regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(e)    the market reacted promptly to public information disseminated by Defendants;

(f)    Fifth Third's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales

force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace;

(g) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Fifth Third's securities; and

(h) without knowledge of the misrepresented or omitted material facts alleged herein, the Company purchased shares of Fifth Third's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were revealed.

145. In the alternative, the Company is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against the Directors Defendants are primarily predicated upon omissions of material facts which there was a duty to disclose.

## XIII. <u>NO SAFE HARBOR</u>

146. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged herein.

147. First, Defendants statements and omissions alleged to be false and misleading relate to historical facts or existing conditions, and omissions are not protected by the statutory safe harbor. Defendants' false and misleading statements and omissions alleged herein are not forward-looking because such statements: (1) relate to historical or current fact; (2) implicate existing conditions; and (3) do not contain projections of future performance or future objective. To the extent that any of the alleged false and misleading statements and omissions might be construed to touch on future intent, they are mixed statements of present facts and future intent

and are not entitled to safe harbor protection with respect to the part of the statement that refers to the present.

148.     Second, any purported forward-looking statements were not accompanied by meaningful cautionary language because any risks that Defendants warned of had already come to pass, and any cautionary language did not mention important factors of similar significance to those actually realized.  Additionally, to the extent Defendants included any cautionary language, such language was not meaningful because any potential risks identified by Defendants had already manifested.  To the extent Defendants included any cautionary language, it was not precise, not meaningful, and did not relate directly to any forward-looking statements at issue.  The cautionary language was boilerplate and did not meaningfully change during the Relevant Period, despite the fact that conditions had materially changed.

149.     Third, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements were made, the speaker knew the statement was false when made.

## XIV.  DAMAGES TO THE COMPANY

150.     As a direct and proximate result of Defendants' conduct, Fifth Third has lost and expended, and will lose and expend, many millions of dollars.

151.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of its current and former officers, and the CFPB Action filed against Fifth Third Bank, any internal investigations, and any amounts paid to outside lawyers, accountants, and investigators in connection thereto, including in connection with the extensive three-year investigation that led to the CFPB Action.

152.     Such losses include, but are not limited to, handsome compensation and benefits paid to Defendants who breached their fiduciary duties to the Company.

153.     Such losses include the Company's overpayment by approximately $2.1 billion for repurchases of its own stock during the Relevant Period, during which the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

154.     As a direct and proximate result of Defendants' conduct, Fifth Third has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and Defendants' breaches of fiduciary duties and unjust enrichment.

## XV.     DERIVATIVE ALLEGATIONS

155.     Plaintiff brings this action derivatively and for the benefit of Fifth Third to redress injuries suffered, and to be suffered, as a result of Defendants' breaches of their fiduciary duties as directors and/or officers of Fifth Third, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, as well as the aiding and abetting thereof.

156.     Fifth Third is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

157.     Plaintiff is, and has continuously been at all relevant times, a shareholder of Fifth Third. Plaintiff will adequately and fairly represent the interests of Fifth Third in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## XVI.   DEMAND FUTILITY ALLEGATIONS

158.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

36

159.     A pre-suit demand on the Board of Fifth Third is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following fourteen individuals: Defendants Carmichael, Akins, Benitez, Blackburn, Brumback, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, and Williams (the "Director-Defendants"), along with non-parties Bayh and Mitchell S. Feiger (together, the "Directors"). Plaintiff needs only to allege demand futility as to seven of these fourteen Directors.

160.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact while three of them engaged in insider sales based on material non-public information, and, at the same time, to cause the Company to overpay by over $2.1 billion for repurchases of its own stock, all of which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

161.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors.  As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

**Defendant Carmichael**

162.     Demand on Defendant Carmichael is futile.  Defendant Carmichael has served as the Company's President, CEO and as a Company director since 2015.  He has also served as the

elected Chairman of the Board since 2018. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Carmichael with his principal occupation, and he receives handsome compensation as described above, including $8,999,237 during the fiscal year ended December 31, 2019. Defendant Carmichael was ultimately responsible for the false and misleading statements and omissions made during his tenure, including those contained in the 2015, 2016, 2017, 2018 and 2019 Form 10-Ks, which he signed and signed SOX certifications for and the January 30, 2020 press release. As the Company's highest officer and as a trusted director, Defendant Carmichael conducted little, if any, oversight of the customer account misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded at least $5.8 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Carmichael is a defendant in the Securities Class Action.

**Defendant Akins**

163. Demand on Defendant Akins is futile. Defendant Akins has served as a Company director since 2013. Defendant Akins also serves as Chair of the Nominating and Corporate Governance Committee, and as a member of the Finance Committee and Human Capital and Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the customer account misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Akins signed, and thus personally made the false and misleading statements in the 2015, 2016, 2018, and 2019 Form 10-Ks.

**Defendant Benitez**

164.    Demand on Defendant Benitez is futile. Defendant Benitez served as a Company director since 2015.  Defendant Benitez also serves as a member of the Audit, Nominating and Corporate Governance, and Risk and Compliance Committees.  As a trusted Company director, he conducted little, if any, oversight of the customer account misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Furthermore, Defendant Benitez signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018, and 2019 Form 10-Ks.

**Defendant Blackburn**

165.    Demand on Defendant Blackburn is futile.  Defendant Blackburn has served as a Company director since 2014.  Defendant Blackburn also serves as a member of the Nominating and Corporate Governance Committee and the Risk and Compliance Committee.  As a trusted Company director, Defendant Blackburn conducted little, if any, oversight of the customer account misconduct and the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets.  Furthermore, Defendant Blackburn signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018, and 2019 Form 10-Ks.

**Defendant Brumback**

166.    Demand on Defendant Brumback is futile.  Defendant Brumback has served as a Company director since 2009.  Defendant Brumback also serves as Chair of the Audit Committee and as a member of the Finance Committee.  As a trusted Company director, Defendant Brumback

conducted little, if any, oversight of the customer account misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Brumback signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018, and 2019 Form 10-Ks. His insider sale before the fraud was exposed, which yielded at least $100,320 in proceeds, demonstrates his motive in facilitating and participating in the fraud.

**Defendant Daniels**

167. Demand on Defendant Daniels is futile. Defendant Daniels has served as a Company director since 2019. Defendant Daniels also serves as a member of the Audit Committee and the Risk and Compliance Committee. As a trusted Company director, he conducted little, if any, oversight of the customer account misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Daniels signed, and thus personally made the false and misleading statements in the 2019 Form 10-K.

**Defendant Harvey**

168. Demand on Defendant Harvey is futile. Defendant Harvey has served as a Company director since 2019. Defendant Harvey also serves as a member of the Nominating and Corporate Governance Committee and the Risk and Compliance Committee. As a trusted Company director, he conducted little, if any, oversight of the customer account misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his

duties to protect corporate assets. Furthermore, Defendant Harvey signed, and thus personally made the false and misleading statements in the 2019 Form 10-K.

## Defendant Heminger

169.     Demand on Defendant Heminger is futile. Defendant Heminger has served as a Company director since 2006. Defendant Heminger also serves as Chair of the Finance Committee and as a member of the Human Capital and Compensation Committee and the Nominating and Corporate Governance Committee. As a trusted Company director, he conducted little, if any, oversight of the customer account misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Heminger signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018 and 2019 Form 10-Ks.

## Defendant Hoover

170.     Demand on Defendant Hoover is futile. Defendant Hoover has served as a Company director since 2009. Defendant Hoover also serves as Chair of the Risk and Compliance Committee, and as a member of the Audit Committee and Finance Committee. As a trusted Company director, Defendant Hoover conducted little, if any, oversight of the customer account misconduct and the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Hoover signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, and 2019 Form 10-Ks. Defendant Hoover's insider sales before the fraud was exposed, which yielded at least $268,640 in proceeds, demonstrate her motive in facilitating and participating in the fraud.

**Defendant Mallesch**

171.     Demand on Defendant Mallesch is futile.  Defendant Mallesch has served as a Company director since 2016.  Defendant Mallesch also serves as a member of the Audit, Human Capital and Compensation, and Risk and Compliance Committees.   As a trusted Company director, she conducted little, if any, oversight of the customer account misconduct and the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets.  Furthermore, Defendant Mallesch signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, and 2019 10- Ks.

**Defendant McCallister**

172.     Demand on Defendant McCallister is futile.  Defendant McCallister has served as a Company director since 2011.  Defendant McCallister also serves as Chair of the Human Capital and Compensation Committee and as a member of the Finance Committee.  As a trusted Company director, he conducted little, if any, oversight of the customer account misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Furthermore, Defendant McCallister signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018 and 2019 Form 10-Ks.

**Defendant Williams**

173.     Demand on Defendant Williams is futile.  Defendant Williams has served as a Company director since 2008.  Defendant Williams also serves as a member of the Audit Finance Committee and the Human Capital and Compensation Committee.  As a trusted Company director, she conducted little, if any, oversight of the customer account misconduct and the scheme to make

false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Williams signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, and 2019 10- Ks.

**Non-Party Bayh**

174.     Non-party Bayh served as a director throughout the Relevant Period, along with the Director Defendants, approved of the aforementioned repurchases, and signed the aforementioned Form 10-Ks.

**Non-Party Feiger**

175.     Non-party Mitchell S. Feiger served as the CEO and Chairman of Fifth Third Bank, the subject of this action, the CFPB Action, and the Securities Class Action. Thus, even demand upon the non-party Directors would be futile, and thus excused.

**Defendants Mallesch, Benitez, Daniels and Hoover**

176.     Defendants Mallesch, Benitez, Daniels, and Hoover (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Charter of the Audit Joint Committee of the Board of Fifth Third and Fifth Third Bank, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's accounting and financial reporting processes, the Company's significant risk exposures, the adequacy and effectiveness of Fifth Third's internal controls, and the Company's compliance with legal and regulatory requirements. The Audit Committee was responsible for overseeing the administration of the Code of Conduct, and for handling ethics concerns brought through the Company's ethics hotline. The Audit Committee Defendants failed to adequately execute these responsibilities and to ensure the integrity of the Company's accounting and financial reporting

processes, as they are charged to do under the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

**Defendants Brumback, Benitez, Blackburn, Daniels, and Harvey**

177.    Defendants Brumback, Benitez, Blackburn, Daniels, and Harvey (the "Risk and Compliance Committee Defendants") served as members of the Risk and Compliance Committee during the Relevant Period.  Pursuant to the Charter of the Risk and Compliance Joint Committee of the Board of Fifth Third and Fifth Third Bank, the Risk and Compliance Committee Defendants are responsible for overseeing, among other things, management's compliance with all of Fifth Third's regulatory obligations arising under applicable federal and state banking laws, rules and regulations, development and implementation of a global risk management framework, the fiduciary activities and policies of the Company and its subsidiaries, and the Company's and the Bank's risk processes and governance structure.  The Risk and Compliance Committee Defendants failed to uphold these responsibilities, as evinced by the long-standing misconduct plaguing the Company and the Bank discussed herein that ultimately led to the CFPB Action.  Thus, the Risk and Compliance Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

178.    The Director-Defendants have longstanding business and personal relationships with each other and Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  For instance, Defendant Blackburn is and has been a party to related transactions with the Company. Defendant Blackburn is the Executive Vice President of the Cincinnati Bengals, which the Company paid $1.8 million for sponsorship arrangements, tickets, and advertising expenses.  Even before Defendant Blackburn became a

Board member, the Company was engaged in and signed a five-year extension contract with the sports team that called for total payments to the Cincinnati Bengals during that time period that totaled over $7.9 million. According to the 2020 Proxy Statement, "[b]y virtue of Ms. Blackburn's being an executive officer and a principal owner of the Cincinnati Bengals, she is deemed to be a related party having a direct material interest in these arrangements." These conflicts of interest precluded the Director Defendants from adequately monitoring the Company's operations and internal controls and calling into question Defendants' conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

179. In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's internal controls over public reporting, and of the Company's engagement in the customer account misconduct and Defendants' scheme to issue materially false and misleading statements to the public and facilitate and disguise Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Director Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

180. Fifth Third has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Fifth Third any part of the damages Fifth Third suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

181. Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their

violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

182. The acts complained of herein constitute violations of fiduciary duties owed by Fifth Third officers and directors, and these acts are incapable of ratification.

## XVII. CAUSES OF ACTION

### COUNT I

### (Against Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act)

183. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

184. Defendants participated in a scheme to defraud with the purpose and effect of defrauding Fifth Third. Not only is Fifth Third now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon Fifth Third by Defendants. With the price of its common stock trading at artificially-inflated prices during the Relevant Period due to Defendants' misconduct, Defendants caused the Company to repurchase millions of its own shares at artificially-inflated prices, damaging Fifth Third.

185. During the Relevant Period, Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the

Company's periodic reports filed with the SEC while engaging in and/or allowing the conduct described above.

186.    Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Fifth Third not misleading.

187.    Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as directors and officers of the Company, Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Fifth Third.

188.    Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

189.    In addition to each of the Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, they made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

190.    By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

191.    Plaintiff, on behalf of Fifth Third, has no adequate remedy at law.

## COUNT II

### (Against Defendant Carmichael for Violations of Section 20(a) of the Exchange Act)

192.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

193.    Defendant Carmichael, by virtue of his positions with Fifth Third and his specific acts, was, at the time of the wrongs alleged herein, controlling person of Fifth Third and who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act.  Defendant Carmichael had the power and influence and exercised the same to cause Fifth Third to engage in the illegal conduct and practices complained of herein and violate § 10(b) of the Exchange Act.

194.    Plaintiff, on behalf of Fifth Third, has no adequate remedy at law.

## COUNT III

### (Against Defendants for Breach of Fiduciary Duties)

195.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

196.    Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Fifth Third's business and affairs.

197.    Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

198.    Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.  Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Fifth Third.

199.    In breach of their fiduciary duties owed to Fifth Third, Defendants willfully or recklessly engaged in and/or facilitated the customer account misconduct, and made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's aggressive efforts to promote its cross-sell strategy, including utilizing incentive-based programs tied to unrealistic sales targets, caused employees to engage in the customer account misconduct; (2) Fifth Third Bank, and the Company by extension, were aware of the customer account misconduct and its resultant illegality and harm to consumers as early as 2008; (3) despite this awareness, the Company neglected to employ and monitor its cross-sell program appropriately in a manner that would identify and prevent the customer account misconduct and ensure affected consumers were identified and made whole; (4) the foregoing exposed Fifth Third to a foreseeable risk of heightened regulatory scrutiny and/or inquiries, like the three-year extensive CFPB investigation; (5) consequently, the Company's profits and prospects were unsustainable, as they were at least partially produced through illicit and improper conduct; and (6) the Company failed to maintain internal controls.

200.    As a result of the foregoing, the public statements were materially false and misleading at all relevant times.

201.    Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of

material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

202.     In further breach of their fiduciary duties, Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

203.     Defendants also breached their fiduciary duties by causing the Company to waste its corporate assets, repurchasing over 216 million shares of its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while three of them engaged in improper insider sales, netting proceeds of approximately $6.1 million.

204.     Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities, and disguising insider sales.

205.     Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly

and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

206. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

207. As a direct and proximate result of Defendants' breaches of their fiduciary obligations, Fifth Third has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, Defendants are liable to the Company.

208. Plaintiff, on behalf of Fifth Third, has no adequate remedy at law.

## COUNT IV

### (Against Defendants for Unjust Enrichment)

209. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

210. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, Fifth Third.

211. Defendants either benefited financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Fifth Third that was tied to the performance or artificially inflated valuation of Fifth Third, or received compensation that was unjust in light of Defendants' bad faith conduct.

212. Plaintiff, as a shareholder and a representative of Fifth Third, seeks restitution from Defendants and seeks an order from this Court disgorging all profits— including from insider

sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by Defendants due to their wrongful conduct and breach of their fiduciary duties.

213.     Plaintiff, on behalf of Fifth Third, has no adequate remedy at law.

## COUNT V

### (Against Defendants for Waste of Corporate Assets)

214.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

215.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Fifth Third to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, and to lose financing from investors and business from future customers who no longer trust the Company and its products. In addition, Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

216.     As a result of the waste of corporate assets, Defendants are each liable to the Company.

217.     Plaintiff, on behalf of Fifth Third, has no adequate remedy at law.

## XVIII. REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## XIX.   **<u>DEMAND FOR TRIAL BY JURY</u>**

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 10, 2020               Respectfully submitted,

*/s/* Daniel O. Herrera
Jennifer W. Sprengel
Daniel O. Herrera
Kaitlin Naughton
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
150 S. Wacker, Suite 3000
Chicago, Illinois 60606
Telephone: 312-782-4880
Facsimile: 312-782-4485
jsprengel@caffertyclobes.com
dherrera@caffertyclobes.com
knaughton@caffertyclobes.com

**GAINEY McKENNA & EGESTON**
Thomas J. McKenna
Gregory M. Egleston
501 fifth Avenue South, 19th Floor
New York, NY  10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*

## VERIFICATION

I, PETER T. HANSEN, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Fifth Third Bancorp, common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _11th_ day of _August_ 2020.

_____
PETER T. HANSEN